**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

MATSON NAVIGATION COMPANY,
INC.,

*Plaintiff*,

v.

DEPARTMENT OF TRANSPORTATION,
*et al.*,

*Defendants,*

APL MARITIME, LTD.,

*Intervenor-Defendant in
No. 21-cv-1606*,

APL MARINE SERVICES, LTD.,

*Intervenor-Defendant in
No. 22-cv-1975.*

Civil Action No. 21-1606 (RDM)
Civil Action No. 22-1975 (RDM)

<u>**MEMORANDUM OPINION**</u>

In these consolidated cases, Plaintiff Matson Navigation Company, Inc. ("Matson") asks

the Court to set aside two orders issued by Defendant Maritime Administration ("MARAD"),

each of which approved an application submitted by Defendant-Intervenors APL Maritime, Ltd.

and APL Marine Services, Ltd. (collectively, "APL") to replace a vessel participating in the

Maritime Security Program.  Under the Maritime Security Program, a participating vessel owner

receives a substantial, annual payment in return for a promise to make the participating vessel

available to the United States in times of conflict or national emergency.  Although the chain of

relevant events reaches back many years, the first order that Matson challenges approved the

replacement of the APL GUAM with the CMA CGM HERODOTE in April 2021, and the

second order approved the replacement of the APL AGATE with the CMA CGM DAKAR in June 2022.[1]  Qualification as a "replacement vessel" is important because Congress amended the Maritime Security Act in 2017 to preclude participating vessels from operating "in the transportation of cargo between points in the United States and its territories," but excepted replacement vessels from this new limitation.  46 U.S.C. § 53105(a)(2).  Under that amendment, replacement vessels are grandfathered into the old regime and remain subject to the preexisting rule, which allowed vessels participating in the Maritime Security Program to transport cargo between the United States and its territories so long as they were "operated exclusively in foreign commerce or . . . in mixed foreign commerce and domestic trade allowed under a registry endorsement issued under [S]ection 12111" of Title 46, and not "operated in the coastwise trade."  *Id.* § 53105(a)(1).

Matson, which competes with APL in the Guam-Pacific trade, challenges MARAD's orders approving the participation of the HERODOTE and the DAKAR under the Maritime Security Program on multiple grounds.  First, Matson argues that neither vessel would qualify for the program under the 2017 amendment because both engage in trade between the United States and Guam (a U.S. territory).  Second, Matson maintains that neither vessel is entitled to take advantage of the grandfather provision because neither qualifies as a "replacement vessel."  The DAKAR does not qualify, on Matson's telling, because the vessel it was meant to replace, the AGATE, was scrapped years before the DAKAR was offered as a replacement vessel and was therefore not a "vessel" operating "under an operating agreement" in 2022, when MARAD approved the substitution of the DAKAR as its replacement.  And the HERODOTE does not

_____

[1] Although the HERODOTE and DAKAR have since been renamed, for the sake of clarity and simplicity, the parties have continued to refer to the two vessels at issue by these names.  The Court will follow their lead.

qualify, according to Matson, because the vessel that it was supposed to replace, the GUAM, was not qualified to participate in the Maritime Security Program in the first place.  Third, Matson claims that, even under the grandfather provision, neither vessel qualifies to participate in the program because the HERODOTE engages in (what Matson views as) impermissible coastwise trade with the Northern Mariana Islands, and, although the DAKAR does not currently call on the Northern Mariana Islands, MARAD's approval order contemplates that it might do so in the future.  Finally, Matson contends that, even if MARAD's orders can be justified under the statute and regulations, the Court should nonetheless set them aside because the agency failed adequately to explain its reasoning and failed to wrestle with several substantial questions.

MARAD and APL, in turn, disagree with each of these contentions.  On their telling, MARAD did nothing illegal and nothing out of the ordinary.  The agency approved APL's applications to substitute the HERODOTE and DAKAR for participating vessels, and nothing in the Maritime Security Act or MARAD's implementing regulations precludes a replacement vessel (or, for that matter, a vessel subject to replacement) from engaging in non-government trade with the Northern Mariana Islands.  Nor is there any serious question, according to MARAD and APL, about MARAD's reasoning, which simply reflects the plain language of the governing statute and regulations.

Pending before the Court are the parties' cross-motions for summary judgment.  Dkt. 35; Dkt. 37; Dkt. 38.  For the reasons explained below, the Court will **DENY** Matson's motion for summary judgment as to both the 2021 approval order for the HERODOTE and the 2022 approval order for the DAKAR, and the Court will **GRANT** MARAD and APL's cross-motions for summary judgment as to both orders.

## I. BACKGROUND

**A.    Statutory Background**

1.   *The Maritime Security Fleet*

In the Maritime Security Act of 1996 ("MSA"), Pub. L. No. 104-239, 110 Stat. 3118, Congress instructed "[t]he Secretary of Transportation, in consultation with the Secretary of Defense" to establish a "Maritime Security Fleet" of "active, commercially viable, militarily useful, privately owned vessels to meet national defense and other security requirements and maintain a United States presence in international commercial shipping."  46 U.S.C. § 53102(a). Pursuant to this authority, the Secretary established the Maritime Security Program ("MSP"), *see id.* §§ 53101–53111, and delegated its administration to the Maritime Administrator, who heads MARAD, *see* 49 C.F.R. § 1.93(a).  In exchange for agreeing to participate in the Maritime Security Fleet, MSP participants receive an annual payment for each vessel enrolled in the fleet. *See* 46 U.S.C. § 53106(a)(1)(E).

To participate in the Maritime Security Fleet, a vessel must meet several eligibility requirements.  It must be a U.S.-flagged vessel by the time it enters into the program.  *Id.* § 53102(b)(5).  The owners of the vessel must, with some exceptions, be U.S. citizens.  *Id.* § 53102(c).  The vessel cannot be older than ten or fifteen years (depending on the type of vessel) on the date it is included in the fleet.  *Id.* § 53102(b)(3).  It must be "suitable for use by the United States for national defense or military purposes in time of war or national emergency" and be "commercially viable."  *Id.* § 53102(b)(4)(A)–(B).  Finally, and as relevant to this case, the vessel must be "operated (or in the case of a vessel to be constructed, will be operated) in providing transportation in foreign commerce."  *Id.* § 53102(b)(2).  The Maritime Security Act defines "foreign commerce" as "commerce or trade between the United States, its territories or

possessions, or the District of Columbia, and a foreign country" and "commerce or trade between foreign countries."[2]  *Id.* § 53101(4).

All vessels in the Maritime Security Fleet must enter into two agreements with the U.S. Secretary of Transportation.  First, the owner of the vessel must "enter into an operating agreement with the Secretary."  *Id.* § 53103(a).  In the case of a "new operating agreement[,]" the vessel must generally be owned or operated by one or more U.S. citizens, and the vessel must satisfy the conditions discussed above.  *Id.* § 53013(c).  In addition, for vessels covered by operating agreements before 2018 and for "replacement vessels" for those vessels, the agreement must "require that, during the period the vessel is operating under the agreement," it "operate[] exclusively in the foreign commerce or . . . in mixed foreign commerce and domestic trade allowed under a registry endorsement under [S]ection 12111 of . . . title" 46, and must "not otherwise be operated in the coastwise trade."[3]  *Id.* § 53105(1)(A)–(B).  For vessels that are first covered by an operating agreement after 2018 or that do not qualify as "replacement vessels," however, the operating agreement must preclude the vessel, "during the period [that it] is

---

[2]  As discussed further below, the MARAD regulations define "foreign commerce" as "a cargo freight service, including direct and relay service, operated exclusively in the foreign trade or in mixed foreign and domestic trade allowed under a registry endorsement under 46 U.S.C. 12111 where the origination point or the destination point of any cargo carried is the United States, regardless of whether the vessel provides direct service between the United States and a foreign country, or commerce or trade between foreign countries."  46 C.F.R. § 296.2.

[3]  MARAD's regulations track the statutory text.  They provide:  "The MSP Operating Agreement shall require that during the period an Eligible Vessel is included in that Agreement, the Eligible Vessel shall: (1) . . . [b]e documented as a U.S.-flag vessel under 46 U.S.C. chapter 121; and (2) . . . [b]e operated exclusively in the U.S.-foreign commerce or in mixed foreign commerce and domestic trade allowed under a registry endorsement issued under 46 U.S.C. 12105, and shall not otherwise be operated in the coastwise trade of the United States."  49 C.F.R. § 1.93.  At the time the regulations were promulgated, the registry endorsement provision that is now codified at 46 U.S.C. § 12111 was codified at 46 U.S.C. § 12105.  *See* 97 Stat. 586, Pub. L. No. 98-89 (Aug. 26, 1983).

operating under the agreement," from transporting "cargo between points in the United States and its territories." *Id.* § 53105(a)(2). Under the Act, "[a] contractor may replace a vessel under an operating agreement with another vessel that is eligible to be included in the Fleet under [S]ection 53102(b), if the Secretary, in conjunction with the Secretary of Defense, approves the replacement vessel." *Id.* § 53105(f).

Second, the operating agreement must require the contractor to enter into a separate "Emergency Preparedness Agreement . . . with the Secretary." *Id.* § 53107(a). Under that agreement, the contractor must commit to "make commercial transportation resources (including service) available, upon request by the Secretary of Defense during a time of war or national emergency, or whenever the Secretary of Defense determines that it is necessary for national security or contingency operation." *Id.* § 53107(b)(1). Should the Secretary of Defense need to invoke this provision, the contractor would receive compensation in addition to the compensation provided under the separate operating agreement. *Id.* § 53107(e).

2. *Maritime Endorsements*

As explained above, the Maritime Security Act operates against the backdrop of a broader maritime documentation regime, which applies to most vessels that sail under the U.S. flag. To engage in commercial trade, a U.S.-flagged vessel generally requires "a certificate of documentation with an endorsement for that trade." 46 U.S.C. § 12102(a). These endorsements are issued by the Coast Guard. 46 C.F.R. § 67.1; *id.* § 67.3; *see, e.g.*, Dkt. 46-1 at 374 (DAR 753) (DAKAR's registry endorsement). There are four types of endorsements: registry (46 U.S.C. § 12111), coastwise (*id.* § 12112), fishery (*id.* § 12113), and recreational (*id.* § 12114). Certain requirements are common to all endorsements. Endorsements are available, for example, only for vessels over a certain weight that are "not documented under the laws of a foreign country," *id.* § 12103(a)(2), (3), and only for vessels owned by "eligible owners" (generally, U.S.

citizens, the U.S. and state governments, and organizations owned or controlled by U.S. citizens), *id.* § 12103(b).

The four endorsements allow vessels to engage in different sets of activities, and there are endorsement-specific eligibility requirements in addition to the general requirements that apply to all endorsements. For present purposes, the most important distinction is that between a coastwise endorsement and a registry endorsement. That distinction turns on the reach of the "coastwise" laws, a term of art defined in the Merchant Marine Act of 1920 (the "Jones Act"), Pub. L. No. 66-261, § 27, 41 Stat. 988, 999 (codified at 46 U.S.C. § 55101 *et seq.*). By statute, the coastwise laws "apply to the United States, including the island territories and possessions of the United States" except for (1) American Samoa, (2) the Northern Mariana Islands (with one important exception discussed *infra*), and (3) the Virgin Islands. 46 U.S.C. § 55101.

A coastwise endorsement allows a vessel to participate in "coastwise" trade, which the statute defines as trade "between points in the United States to which the coastwise laws apply."[4] *Id.* § 55102(b). Thus, a vessel with a coastwise endorsement may engage in trade between points in the continental United States—for example, from New Orleans to Baltimore—and can also engage in trade between the United States and the island territories not excepted—for example, from Los Angeles to Guam. There are strict requirements for obtaining a coastwise endorsement. The vessel must have been "built in the United States," "captured in war by citizens of the United States and lawfully condemned as prize," "adjudged to be forfeited for a breach of the laws of the United States," or "wrecked on the coast of the United States or

---

[4] The MSP regulations, in contrast, define "coastwise trade" and "domestic trade" to mean "trade between points in the United States," and define the United States to include "the 50 U.S. States, the District of Columbia, the Commonwealth of Puerto Rico, the Northern Mariana Islands, Guam, American Samoa, and the Virgin Islands." 46 C.F.R. § 296.2.

adjacent waters" and sufficiently "repair[ed] in a shipyard in the United States." *Id.* §§ 12112,

12107.  These requirements are intended to ensure that U.S.-built ships (which are relatively

expensive to build) are protected from competing with foreign-built ships (which are often less

expensive to build) in domestic trade.  *See Indep. U.S. Tanker Owners Comm. v. Lewis*, 690 F.2d

908, 912 (D.C. Cir. 1982).

A registry endorsement, on the other hand, allows a vessel to participate in foreign trade

and in trade with a specified list of U.S. territories.  Under the Jones Act, vessels with registry

endorsements "may engage in foreign trade or trade with Guam, American Samoa, Wake,

Midway, or Kingman Reef."  46 U.S.C. § 12111(b).  Thus, a registry endorsement permits a

vessel to engage in trade between the United States and a foreign country—for example, from

Baltimore to Antwerp-Bruges—and also to engage in trade between the United States and one of

the listed island territories—for example, from Los Angeles to Guam.  The governing Coast

Guard regulations permit vessels with a registry endorsement to engage "in the foreign trade;

trade with Guam, American Samoa, Wake, Midway, or Kingman Reef;" and, as relevant here,

any other trade "for which a coastwise or fishery endorsement is not required."  46

C.F.R.§ 67.17(a).

There is some overlap between registry endorsements and coastwise endorsements when

it comes to the U.S. territories.  Guam, for example, is subject to the coastwise laws because it is

an "island territory or possession[]" not otherwise exempted under 46 U.S.C. § 55101.  Vessels

with coastwise endorsements can therefore engage in trade between Guam and the mainland

United States.  But Guam is also on the list of territories for which trade under a registry

endorsement is permitted.  *See id.* § 12111(b).

### 3. *Subsidies for MSP Participation*

The owners of vessels in the Maritime Security Fleet receive multimillion-dollar yearly stipends paid out in monthly installments, currently set at $6.5 million per year. *Id.* § 53106(a)(1)(C). "As a condition of receiving payment," the contractor must "certify" that the vessel "has been and will be" operated in commerce pursuant to the relevant requirements for new or replacement vessels "for at least 320 days in the fiscal year." *Id.* § 53106(b). "Days during which the vessel is drydocked, surveyed, inspected, or repaired shall be considered days of operation for purposes of this subsection." *Id.* If the contractor satisfies the 320-day requirement, the Secretary is required to make fixed payments in monthly installments. *See id.* § 53106(a)(2). But the Secretary must "make a *pro rata* reduction in payment for each day less than 320 in a fiscal year that the vessel is not operated in accordance with paragraph (1) and (2) of [S]ection 53105(a)"—that is, the provision limiting operation of the vessel to foreign commerce or mixed foreign commerce and domestic trade pursuant to a registry endorsement issued under [46 U.S.C. §] 12111" by the Coast Guard—"with days during which the vessel is drydocked or undergoing survey, inspection, or repair considered to be days on which the vessel is operated." *Id.* § 53106(d)(3). Finally, "[i]f the contractor with respect to an operating agreement materially fails to comply with the terms of the agreement," the Secretary is required to "notify the contractor and [to] provide a reasonable opportunity to comply" and may terminate the operating agreement for noncompliance only after providing the contractor with a reasonable opportunity to cure the default. *Id.* § 53104(c)(1).

### 4. *Commonwealth of the Northern Mariana Islands*

The Commonwealth of the Northern Mariana Islands ("CNMI") is an unincorporated territory and commonwealth of the United States located in the Northwestern Pacific Ocean and includes the island of Saipan. Its governing document is the Covenant to Establish a

Commonwealth of the Northern Mariana Islands in Political Union with the United States of

America (the "Covenant"), which is codified at 48 U.S.C. § 1801 (note).

The Covenant, among other things, limits the reach of U.S. coastwise laws in the

Northern Mariana Islands.  Pursuant to Section 503(a) of the Covenant, "the coastwise laws of

the United States" "will not apply to the Northern Mariana Islands," "except as otherwise

provided in Subsection (b) of Section 502."  Covenant, § 503(a).  Section 502(b) then provides:

> The laws of the United States regarding coastal shipments and the conditions of
> employment, including the wages and hours of employees, will apply to the
> activities of the United States Government and its contractors in the Northern
> Mariana Islands.

Covenant, § 502(b).  Thus, under the Covenant, the coastwise laws of the United States apply in

the CNMI only to "the activities of the United States Government and its contractors."  *Id.*  This

tracks the Jones Act, which provides that the coastwise laws apply to the United States and its

territories and possessions but do not apply to trade with "the Northern Mariana Islands, except

as provided in [S]ection 502(b) of the Covenant."  46 U.S.C. § 55101.  And it matters under the

governing Coast Guard regulations, which permit a vessel to operate with a registry endorsement

under 46 U.S.C. § 12111, if the vessel is engaged in trade "for which a coastwise or fishery

endorsement is not required."  46 C.F.R. § 67.17(a).

**B.    Factual Background**

In an array of decisions, the D.C. Circuit and this Court have recounted much of the

relevant factual background.  *See, e.g.*, *Matson Nav. Co. v. U.S. Dep't of Transp.*, 2022 WL

3576208 (D.D.C. Aug. 19, 2022) ("*Matson VII*").  The most recent iteration of this long-running

dispute challenges two MARAD orders, one approving APL's application to replace the GUAM

with the HERODOTE, and the other approving APL's application to replace the AGATE with

the DAKAR.  As to each vessel, however, the relevant facts reach further back than these

approval orders.  The Court, accordingly, will briefly recount the lineage of the AGATE, to the

SAIPAN, and, finally, to the DAKAR, and the lineage of the CYPRINE, to the GUAM, and,

finally, to the HERODOTE, along with the corresponding history of the relevant administrative

proceedings and litigation.

APL's participation in the MSP began in January 2005, when the Secretary of

Transportation entered into nine operating agreements with APL.  *See Matson Navigation Co. v.*

*U.S. Dep't of Transp.*, 466 F. Supp. 3d 177, 183 (D.D.C. 2020) ("*Matson II*"), *vacated in part as*

*moot*, 2021 WL 3140374 (D.C. Cir. July 15, 2021).  Two of those vessels—the AGATE and the

CYPRINE—were the progenitors of the present dispute.  Approximately a decade after the

AGATE and the CYPRINE were approved for participation in the Maritime Security Fleet, APL

applied to MARAD for authorization to replace them.  *Id.*  MARAD agreed and approved APL's

application to replace the CYPRINE with the GUAM in October 2015 (the "2015 Approval

Order"), Dkt. 46-1 at 89 (DAR 141), and approved APL's application to replace the AGATE

with the SAIPAN in December 2016 (the "2016 Approval Order"), Dkt. 46-1 at 95 (DAR 193–

95).

"Shortly before MARAD's approval of [the SAIPAN] as a replacement vessel, Matson []

urged MARAD not to allow APL to operate [the GUAM] and [the SAIPAN] in the U.S.-Guam

trade route because they did not meet the statutory requirements for 'replacement vessels.'"

*Matson Navigation Co. v. U.S. Dep't of Transp.*, 895 F.3d 799, 802 (D.C. Cir. 2018) ("*Matson*

*I*").  After MARAD nonetheless approved APL's applications, Matson "filed a protest, styled as

'Amended Appeal of the Determination under the Maritime Security Program Operating

Agreement Numbers MA/MSP-54 and MA/MSP-57.'"  *Id.*  Both challenges posited that the

APL vessels were ineligible to participate in the MSP because they "did not operate in foreign

commerce and were not commercially viable." *Id.* at 803. MARAD disagreed, first concluding

that Matson lacked standing to appeal the 2015 and 2016 Approval Orders and, second,

concluding that both APL vessels met the relevant statutory criteria. *Id.*

Matson then sought review of MARAD's approval orders before the D.C. Circuit. The

D.C. Circuit, however, dismissed Matson's petitions for lack of jurisdiction. *Id.* at 806. With

respect to Matson's challenge to the 2015 Approval Order for the GUAM, the court held that it

lacked jurisdiction because Matson failed to timely petition for review. *Id.* at 804–05. And with

respect to the 2016 Approval Order for the SAIPAN, the court held that it lacked jurisdiction

under the Hobbs Act, 28 U.S.C. § 2342(3)(A), because MARAD had not relied upon any of the

statutes that trigger Hobbs Act jurisdiction in its 2016 Approval Order (in contrast to its 2015

Approval Order, which relied on the Hobbs-Act-triggering § 50501). *Id.* at 806.

Matson then filed suit in this Court, again seeking to challenge both approval orders. *See*

*Matson II*, 466 F. Supp. 3d at 185. APL intervened, and the parties cross-moved for summary

judgment. *Id.* at 180. Among other arguments, MARAD moved to dismiss Matson's challenge

to the 2015 Approval Order for the GUAM for lack of jurisdiction, *id.* at 180–81, and this Court

agreed, *id.* at 181. The 2016 Approval Order for the SAIPAN, however, was on different

footing, since the D.C. Circuit had held that, unlike the 2015 Approval Order, the 2016 Approval

Order "never explicitly invoked" the Hobbs-Act-triggering language and that, as a result, this

Court was vested with jurisdiction to decide the challenge. *Id.* at 192; *see also Matson I*, 895

F.3d at 805. This Court, accordingly, reached the merits of Matson's challenge to the 2016

Approval Order, and held that MARAD had failed adequately "to consider an important aspect

of the problem"—namely, whether only vessels engaged *exclusively* in either foreign commerce

or in mixed foreign and domestic trade allowed under a registry endorsement were eligible to

participate in the program and whether, if so, the SAIPAN's trade routes to and from the CNMI

port of Saipan (which, according to Matson, required a coastwise endorsement rather than a

registry endorsement) rendered the SAIPAN ineligible for participation in the Maritime Security

Fleet.  *Matson II*, 466 F. Supp. 3d at 197.  After considering further argument, the Court vacated

the 2016 Approval Order and remanded the matter to MARAD.  *See Matson Navigation Co. v.*

*U.S. Dep't of Transp.*, 471 F. Supp. 3d 60, 67 (D.D.C. 2020) ("*Matson III*").

     The different jurisdictional rulings in *Matson II* set the challenges to the lineages of the

ships on two different paths.  The Court will describe each in turn, before turning back to the

common issues raised by the approval orders.

1.

     Starting with the 2016 Approval Order, the question of the eligibility of the SAIPAN to

replace the AGATE under the MSP's foreign commerce rules returned to MARAD pursuant to

this Court's remand order.  On remand, MARAD re-approved the SAIPAN as a replacement

vessel (the "2020 Approval Order").  Dkt. 46-1 at 238 (DAR 455).  In the agency's view, the

SAIPAN was eligible to serve as a "replacement vessel," *id.* at 250 (DAR 467), for two reasons.

First, as explained in a memorandum prepared by the Department of Transportation's Office of

Chief Counsel (the "SAIPAN Memorandum"), the Maritime Security Act distinguishes between

eligibility requirements and operating requirements, *id.* at 253–57 (DAR 470–73).  Section

53102(b), which governs *eligibility*, "requires that . . . a vessel must engage in foreign

commerce[] but need not engage *exclusively* in foreign commerce."  *Id.* at 246 (DAR 463).  In

contrast, Section 53105(a)'s requirement that a replacement vessel operate exclusively in foreign

commerce or in mixed trade under a registry endorsement is an *operating* requirement, and

although a potential violation of that requirement might trigger contractual sanctions (like a pro

13

rata diminution in the stipend paid), it would not affect the validity of the agency's approval order. *Id.*

Second, the agency determined that, in any event, the SAIPAN could permissibly engage in trade with the Northern Mariana Islands pursuant to its registry endorsement. Once again relying on the SAIPAN Memorandum, the agency concluded that "U.S.-flag vessels with registry endorsements may engage in trade with Saipan" and, by extension, with the rest of the Northern Mariana Islands, so long as they carry only "commercial cargo." Dkt. 46-1 at 249 (DAR 466). But that reasoning did not extend to the carriage of "government cargo between a U.S. port and the CNMI" without a coastwise endorsement. *Id.* at 248 (DAR 465). As the SAIPAN Memorandum explained, the coastwise laws apply under the Covenant to "the activities of the United States and its contractors in the Northern Mariana Islands," and that condition is "best read to mean that only coastwise-qualified vessels may carry Government cargo between a U.S. port and Saipan." *Id.* at 258 (DAR 475). It does not mean, however, "a vessel engaging in the Saipan trade for commercial cargo" must "have a coastwise . . . endorsement," as opposed to a registry endorsement. *Id.* At that time, the SAIPAN "carrie[d] commercial cargo moving between Saipan and ports in the Continental United States, and intend[ed] to continue to do so," but it "d[id] not . . . carry U.S. Government cargo moving between the Continental United States and Saipan, ha[d] not done so since 2018, and ha[d] no plans to do so in the immediate future." *Id.* at 244–45 (DAR 461–62). As a result, MARAD was satisfied that the SAIPAN could participate in commercial trade with the CNMI without violating the MSA prohibition on coastwise trade other than that "allowed under a registry endorsement issued under [S]ection 12111," 46 U.S.C. § 53105(a)(1).

MARAD also disagreed with Matson's separate argument that the SAIPAN was too old for inclusion in the MSP.  Under 46 U.S.C. § 53102(b)(3)(B), a non-tank vessel must be "15 years of age or less on the date the vessel is included in the Fleet."  *Id.* § 53102(b)(3)(B). Although the SAIPAN was more than fifteen years old at the time the 2020 Approval Order was issued, Dkt. 46-1 at 248 (DAR 465), MARAD determined (at least initially) that the relevant age was the age when the vessel first entered the fleet—in the case of the SAIPAN, 2016, *id.*; *see also id.* at 262 (DAR 479).  MARAD, accordingly, "[r]einstat[ed] the December 20, 2016 approval" for the SAIPAN as a replacement for the AGATE.  *Id.* at 250 (DAR 467).

After the SAIPAN's reinstatement, Matson brought a new suit in this Court, this time challenging the 2020 Approval Order.  *Matson Navigation Co. v. U.S. Dep't of Transp.*, 20-cv-2779 (D.D.C. 2020).  By April 2021, however, MARAD had changed its position as to the age requirement and moved for a voluntary remand, acknowledging that, contrary to its earlier determination, the SAIPAN was, in fact, ineligible to participate in the Maritime Security Fleet because of its age.  *See id.*, Dkt. 20 ("Defendants' Motion for a Voluntary Remand").  The Court granted MARAD's motion and remanded the matter without vacatur, while retaining jurisdiction over the case and ordering MARAD to take further action within 60 days.  *See id.*, Min. Entry (Aug. 4, 2021) ("*Matson V*").  On remand, MARAD "reconsider[ed] its August 3, 2020 Approval" and "determined that the []SAIPAN did not meet the age-eligibility requirement of 46 U.S.C. § 53102(b)(3)(B)."  Dkt. 51-1 at 2.  Departing from its prior reasoning, MARAD concluded that Section 53102(b)(3)(B) is best read to refer to "the date of the operative (rather than any historical) approval."  *Id.* at 6.  Because the "SAIPAN was built in 2002 . . . and was at least 17 years old as of 2020, when the vessel was 'reinstated' into the Fleet," *id.*, the vessel was "not eligible to serve as a replacement vessel under Amended and Restated Maritime Security

Program (MSP) Operating Agreement No. MA/MSP-57," *id.* at 3.  Accordingly, on October 4, 2021, MARAD disapproved the SAIPAN.  *Id.* at 16.

But the story does not end there.  By the time MARAD reconsidered its 2020 Approval Order in October 2021, APL had already applied to replace the SAIPAN with the DAKAR.  Dkt. 46-1 at 38 (DAR 27) (Application dated June 22, 2021).  On August 23, 2021, the Department of Defense had provided a military utility determination for the DAKAR, concluding that the vessel had "military utility" and was "suitable for use by the United States for national defense or military purposes in time of war or national emergency" and that it would be a suitable replacement for the SAIPAN.  *Id.* at 46 (DAR 53).  After the SAIPAN was disapproved, the agency "treated" APL's previously submitted application "as an application to replace the APL AGATE," rather than the SAIPAN, with the DAKAR.  *Id.* at 376 (DAR 756).  In addition, although APL had initially proposed that the DAKAR would serve both Guam and the CNMI, *see* Dkt. 46-1 at 364 (DAR 743), on November 24, 2021, the company informed MARAD that it no longer intended for the DAKAR to call on ports in the CNMI, *id.* at 366 (DAR 745).

On June 15, 2022, MARAD approved the DAKAR to replace the AGATE under Operating Agreement MA/MSP-57 (the "2022 Approval Order").  Dkt. 46-1 at 402 (DAR 782).  The 2022 Approval Order notes that APL "will operate the DAKAR in established trade in the Western Pacific pursuant to a registry endorsement, but will not carry cargo between any State or Territory of the United States and the Commonwealth of the Northern Mariana Islands, except as permitted by U.S. Customs and Border Protection."  Dkt 46-1 at 402 (DAR 782).

That approval led to a new round of challenges, including a challenge based on MARAD's "heel-to-toe" policy.  Since 2017, MARAD's operating agreements had contained a heel-to-toe provision, which required contractors to "begin operating a replacement vessel when

16

a replaced vessel leaves the Fleet." *Id.* at 391 (DAR 771). Here, however, the AGATE had been out of service since the SAIPAN replaced it in December 2016. *Id.* at 78 (DAR 102). In approving the DAKAR as a replacement for the AGATE, MARAD agreed to waive its heel-to-toe policy based on a recommendation set forth in a memorandum from Kevin Tokarski, Associate Administrator for Strategic Sealift (the "DAKAR Memorandum"). *Id.* at 375 (DAR 755). The memorandum lays out the agency's interpretation of a variety of the MSA's statutory provisions and concludes that the DAKAR was eligible to replace the AGATE pursuant to § 53105(f) because, during the interval between the AGATE's removal from the fleet and the DAKAR's entrance, APL operated the SAIPAN in accordance with its obligations under the statute and operating agreement, and because any delay between the SAIPAN's disapproval and the DAKAR's approval "cannot reasonably be attributable to APL." *Id.* at 387–91 (DAR 767–71). On July 15, 2022, MARAD and APL executed Addendum No. 2 to Operating Agreement No. MA/MSP-57, which amended Article I-3 of the operating agreement "to replace the . . . vessel named in the Operating Agreement," that is, the AGATE, "with that of the Replacement Vessel," that is, the DAKAR. Dkt. 46-1 at 409 (DAR 804).

Matson was unmoved. On July 8, 2022, it challenged MARAD's approval of the DAKAR in this Court, No. 22-cv-1975, Dkt. 1 (Compl.). In what was then the third challenge to the AGATE lineage, Matson argued that "[t]he DAKAR is ineligible for MSP subsidies because it engages in impermissible transportation of cargo between points in the United States and its territories in violation of 46 U.S.C. § 53105(a)(2), it does not operate exclusively either in foreign trade or in mixed foreign trade and domestic trade permitted under a registry endorsement issued pursuant to 46 U.S.C. § 12111 in violation of 46 U.S.C. § 53105(a)(1)(A), and it operates in impermissible coastwise trade in violation of 46 U.S.C. § 53105(a)(1)(B)."

No. 22-cv-1975, Dkt. 1 at 3 (Compl. ¶ 12).  "Insofar as the DAKAR does not yet engage in such impermissible trade," Matson argued, "the 2022 Approval Order is unlawful in that it authorizes the DAKAR to engage in trade not permitted under the MSA."  *Id.* at 4 (Compl. ¶ 13).

On the same day it filed suit in Case No. 22-cv-1975, Matson moved for a preliminary injunction before this Court, Dkt. 7.  The Court denied Matson's motion, reasoning that the D.C. Circuit had exclusive jurisdiction to review the challenge pursuant to the Hobbs Act and that, as a result, Matson was unlikely to prevail on the merits.  *Matson VII*, 2022 WL 3576208 (D.D.C. Aug. 19, 2022).  Matson appealed.

2.

Turning back to the GUAM lineage, recall that Matson had appealed the portion of this Court's 2021 Order dismissing its challenges to the GUAM for lack of jurisdiction.  While that appeal was pending, APL applied to substitute the HERODOTE as a replacement for the GUAM under Operating Agreement No. MA/MSP-54.  *See* Dkt. 45 at 12 (HAR 1) (Application dated Jan. 12, 2021).  On April 14, 2021, Kevin Tokarski, Associate Administrator for Strategic Sealift, submitted a memorandum (the "HERODOTE Memorandum") to Acting Maritime Administrator Lucinda Lessley recommending that MARAD approve the HERODOTE as a replacement vessel for the GUAM and approve an amendment to the operating agreement substituting the GUAM with the HERODOTE.  *Id.* at 32 (HAR 126).  The memorandum explained that the HERODOTE met the eligibility requirements under 46 U.S.C. § 53102(b), *id.* at 34–37 (HAR 128–31), including the requirement that the vessel "operate[] in providing transportation in foreign commerce," *id.* at 35 (HAR 129).  It further explained that APL "intend[ed] to operate the HERODOTE in [its] Western Pacific trade routes pursuant to a registry endorsement, including to the Commonwealth of the Northern Mariana Islands," *id.*, and

18

that APL had "confirmed that it [would] not be carrying U.S. Government cargo that is subject to the coastwise laws" under the Covenant for the CNMI, except as permitted by U.S. Customs and Border Protection, *id.* at 36 (HAR 130). And, finally, the memorandum explained that the Secretaries of Defense and Transportation had jointly approved the vessel as a suitable replacement vessel pursuant to Section 53105(f) and 46 C.F.R. § 296.30. *Id.* at 37–38 (HAR 131–32).

On April 26, 2021, MARAD adopted the recommendation contained in the HERODOTE Memorandum and approved the HERODOTE as a replacement vessel for the GUAM (the "2021 Approval Order"). Dkt. 45 at 67 (HAR 161); *see also id.* at 51 (HAR 145). APL and MARAD subsequently executed Addendum No. 1 to Operating Agreement No. MA/MSP-54, which amended the agreement to replace the GUAM with the HERODOTE. *Id.* at 75–77 (HAR 169–71). Then, after MARAD approved the HERODOTE as a replacement vessel for the GUAM, the D.C. Circuit dismissed the appeal of Matson's challenge to the GUAM as moot and, applying the *Munsingwear* doctrine, vacated the portion of this Court's opinion that concerned the GUAM's 2015 Approval Order. *Matson Navigation Co. v. U.S. Dep't of Transp.*, 2021 WL 3140374, at *1 (D.C. Cir. July 15, 2021) ("*Matson IV*").

Matson then filed a new suit in this Court, challenging the 2021 Approval Order for the HERODOTE. No. 21-cv-1606, Dkt. 1. Matson argued that "[t]he HERODOTE is ineligible for MSP subsidies because it does not operate exclusively either in foreign trade or in mixed foreign trade and domestic trade permitted under a registry endorsement issued pursuant to 46 U.S.C. § 12111, and it engages in impermissible transportation of cargo between points in the United States and its territories in violation of 46 U.S.C. § 53105(a)(2)." No. 21-cv-1606, Dkt. 1 at 3 (Compl. ¶ 12). Matson "request[ed] that this Court hold unlawful, vacate, terminate, and set

aside the 2021 Approval Order" "on the grounds that [it] was arbitrary, capricious, and an abuse of discretion," or "otherwise contrary to law or unsupported by substantial evidence in the administrative record." *Id.* (Compl. ¶¶ 13–14).

On August 4, 2022, the Court granted the agency's motion to dismiss, holding that for the same reasoning previously articulated with respect to the DAKAR, the D.C. Circuit had exclusive jurisdiction over challenges to the HERODOTE's approval pursuant to the Hobbs Act. *Matson Nav. Co. v. U.S. Dep't of Transp.*, 619 F. Supp. 3d 223 (D.D.C. 2022) ("*Matson VI*"). Matson appealed.

### 3.

In the D.C. Circuit, the paths of the two lineages reconverged.  At the same time that Matson filed its two suits in this Court challenging MARAD's approval of the HERODOTE and DAKAR as replacement vessels, it also sought direct review of those decisions in the D.C. Circuit pursuant to the Hobbs Act.  The D.C. Circuit ultimately consolidated Matson's appeals of this Court's August 2, 2022 (*Matson VI*) and August 19, 2022 (*Matson VII*) orders with the two direct appeals and (although not raised by any of the parties below or in *Matson I*) held that because "Matson was not a 'party' to the replacement proceedings for either vessel," the court of appeals lacked jurisdiction to consider a direct appeal of either administrative order under the Hobbs Act.  *Matson Navigation Co. v. U.S. Dep't of Transp.*, 77 F.4th 1151 (D.C. Cir. 2023) ("*Matson VIII*").  The D.C. Circuit, accordingly, dismissed the two Hobbs Act petitions for direct review and reversed this Court's orders dismissing *Matson VI* for lack of district court jurisdiction and denying the preliminary injunction in *Matson VII* for similar reasons and remanded both cases to this Court.  *Id.* at 1160.

On remand, the Court consolidated the two cases and set a briefing schedule for cross-motions for summary judgment.  *See* Min. Entry (Oct. 11, 2023).  Matson moved for summary

judgment, asking the Court to vacate MARAD's 2021 Approval Order for the HERODOTE and 2022 Approval Order for the DAKAR. *See* Dkt. 35. MARAD and APL, in response, opposed that motion and cross-moved for summary judgment, asking the Court to uphold MARAD's approval orders. *See* Dkt. 37; Dkt. 38. The Court heard oral argument on those motions and has considered various post-argument filings, including Matson's disavowal of any intention to challenge the Coast Guard regulation the entitles a vessel with a registry endorsement to be "employ[ed]" in trade "for which a coastwise . . . endorsement is not required," 46 C.F.R. § 6717(a). *See* Dkt. 53.[5]

The pending motions are now ripe for decision.

## II. LEGAL STANDARD

Courts must set aside agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "[A] reviewing court must ensure that the agency 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Cumberland Pharm. Inc. v. FDA*, 981 F. Supp. 2d 38, 48 (D.D.C. 2013) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). An agency is also required to "adequately explain its result." *Snohomish Cty., Wash. v. Surface Transp. Bd.*, 954 F.3d 290, 301 (D.C. Cir. 2020) (quoting *Jost v. Surface Transp. Bd.*, 194 F.3d 79, 85 (D.C. Cir. 1999)). "[A]gency actions will be set aside if they are contrary to law—if, in other words, they are not 'authorized by the statutory text.'" *Fisher v. Pension Benefit Guaranty Corp.*, 151

---

[5] The post-argument filings also included a notice from APL informing the Court that on February 5, 2025, it applied to replace the DAKAR with another vessel, Dkt. 56, and a response from Matson to that notice, Dkt. 57. Because that application remains pending before the agency, it has no bearing on the matter now before the Court.

F. Supp. 3d 159, 165 (D.D.C. 2016) (quoting *Gonzales v. Oregon*, 546 U.S. 243, 255 (2006)).  In making that determination, the Court should pay "[c]areful attention to the judgment of the Executive Branch" to the extent it "help[s] inform that inquiry" and should "respect" lawful delegations of "authority to an agency."  *Loper Bright Enterp. v. Raimondo*, 603 U.S. 369, 413 (2024).  But the meaning of the relevant statutory text is ultimately a question for the Court, which "must exercise [its] independent judgment" in interpreting the law.  *Id.* at 412–13.

## III.  ANALYSIS

Matson's challenges to the 2021 Approval Order for the HERODOTE and the 2022 Approval Order for the DAKAR fall into two general categories: challenges to those ships' predecessor vessels and challenges to those ships' engagement in trade with the Commonwealth of the Northern Mariana Islands.

**A.    Challenges Based on the Predecessor Vessels**

Matson first argues that the 2021 and 2022 Approval Orders must be set aside for two related reasons:  First, Matson maintains that the HERODOTE and the DAKAR do not qualify as "replacement vessels" under 46 U.S.C. § 53105(f).  Second, it argues that any non-replacement vessel introduced to the fleet after enactment of the National Defense Authorization Act for Fiscal Year 2018 ("2018 NDAA") may "not be operated in the transportation of cargo between points in the United States and its territories," yet both the HERODOTE and the DAKAR are engaged in trade with the U.S. territories.

Matson is correct that in the case of a non-replacement vessel "first covered by an operating agreement after" enactment of the 2018 NDAA, the operating agreement must specify that, "during the period the vessel is operating under the agreement," it may "not be operated in the transportation of cargo between points in the United States and its territories."  46 U.S.C.

§ 53105(a).  And Matson is correct that both the HERODOTE and the DAKAR engage in trade

with a U.S. territory—both, for example, engage in trade between the United States and Guam.

*See* Dkt. 45 at 30 (HAR 124); Dkt. 46-1 at 366–67 (DAR 745–46).  Matson's argument fails,

however, because MARAD lawfully determined that both the HERODOTE and the DAKAR

qualify as "replacement vessels" and that, accordingly, neither is subject to the post-2018 NDAA

rule.  Because this conclusion suffices to sustain MARAD's approval orders, moreover, the

Court need not reach MARAD's alternative theory that the statute does not categorically forbid

trade between the United States and the territories but, rather, does so only during the 320 or so

days of the year, *see* 46 U.S.C. § 53106(d) (requiring pro rata reduction in payment for each day

less than 320 in a fiscal year that the vessel is not operated in accordance with 46 U.S.C.

§ 53105(a)), during which the vessel must "operat[e] under the agreement," *see id*. § 53105(a).

      As explained above, MARAD approved the DAKAR to replace the AGATE in the 2022

Approval Order and approved the HERODOTE to replace the GUAM in the 2021 Approval

Order.  Under 46 U.S.C. § 53105(f):

> A contractor may replace *a vessel under an operating agreement* with another
> vessel that is eligible to be included in the Fleet under [S]ection 53102(b), if the
> Secretary, in conjunction with the Secretary of Defense, approves the
> replacement of the vessel.

*Id.* § 51305(f) (emphasis added).  Matson first argues that neither the AGATE (the DAKAR's

predecessor) nor the GUAM (the HERODOTE's predecessor) was a "vessel under an operating

agreement," as required under Section 51305(f).  The Court will consider each in turn.

    1.    *The DAKAR*

      The relevant factual record is undisputed, and it shows that by the time MARAD

approved the DAKAR to replace the AGATE in June 2022, Dkt. 46-1 at 398 (DAR 778), the

AGATE had been decommissioned and scrapped, Dkt. 35-1 at 27.  Matson argues that this

means that, at the time MARAD issued the 2022 Approval Order, the AGATE (1) was no longer a "vessel," and, in any event, (2) was not a "vessel under an operating agreement," as required for purposes of Section 53105(f).  The Court is unpersuaded.

**a.**

According to Matson, the term "vessel" refers to a ship capable of transportation on water.  To support this view, Matson invokes the Dictionary Act, which provides that "[t]he word 'vessel' includes every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water."  1 U.S.C. § 3.  It then argues that ships—like the scrapped AGATE—that have been "'rendered permanently incapable of maritime transportation are 'dead ships' that are 'no longer . . . vessels.'"  Dkt. 35-1 at 37 (emphasis omitted) (quoting *Crimson Yacht v. Betty Lyn II Motor Yacht*, 603 F.3d 864, 873 n.4, 874 (11th Cir. 2010)).

But that argument ignores the relevant surrounding text, which provides that "[a] contractor may replace a vessel under an operating agreement with another vessel."  46 U.S.C. § 53105(f).  As the Supreme Court has explained, "[r]egardless of whether [a term] can carry a special meaning in legal usage, 'when interpreting a statute . . . we construe language . . . in light of the terms surrounding it.'"  *FCC v. AT & T Inc.*, 562 U.S. 397, 405 (2011) (quoting *Leocal v. Ashcroft*, 543 U.S. 1, 9 (2004)).  Here, Congress did not refer to an "existing vessel," nor did it use the word "vessel" in isolation.  Rather, it referred to "replac[ing] a vessel," and, as a matter of common usage, it is not at all odd to suggest that something might replace something else that no longer exists.  As APL aptly observes, "[t]he Second Temple replaced Solomon's Temple;" "[t]he current Tacoma Narrows Bridge (opened in 1950) 'replac[ed]' the earlier span that famously collapsed in 1940;" and the new spire that now rises "above Notre-Dame cathedral

24

'replace[d]' the iconic spire that burned down in 2019." Dkt. 38-1 at 30 (citations omitted). Or to borrow the analogy that Judge Wilkins used during oral argument in *Matson VIII*: "If my car breaks down and . . . I don't get around [to] buying another car [for a year], I'm still replacing my old car, even if . . . I sent my old car to the junkyard and it was turned to scrap." Dkt. 38-3 at 9–10, *Matson VIII*, Oral Arg. Tr. 7:21–8:4 (D.C. Cir.).

Nor is Matson's position consistent with the statutory purpose or common sense. The MSA is not, as Matson at times suggests, a mere subsidy program. Rather, Congress authorized the Secretary to establish the Maritime Security Fleet "to meet national defense and other security requirements and [to] maintain a United States presence in international commercial shipping." 46 U.S.C. § 53102(a). Each participant is also required to enter into a separate "Emergency Preparedness Agreement," which commits the vessel owner to "make commercial transportation resources . . . available, upon request by the Secretary of Defense during a time of war or national emergency, or whenever the Secretary of Defense determines that it is necessary for national security or contingency operation." *Id.* § 53107. Matson, however, fails to offer any explanation why Congress would have intended to permit a contractor to replace a functioning vessel with a replacement vessel but to preclude a contractor from replacing a vessel that is destroyed or that is sunken—perhaps during hostilities—with a new vessel. *See* Dkt. 38-3 at 12, *Matson VIII*, Oral Arg. Tr. 11:3–15 (D.C. Cir.) (Pan, J., observing that "[s]hips are not constantly operating[,] [and] they can get sunk if they're called to duty and put into a line of fire").

Finally, Matson's argument fails to come to grips with other statutory text, which uses the term "vessel" to refer to vessels that may not exist at the relevant moment in time. Most notably, Section 53102(b) includes "a vessel to be constructed" in the class of vessels "eligible to be included in the Fleet." In short, the word "vessel" does not invariably mean an "extant vessel,"

25

and context and common-sense support MARAD's conclusion that the statute authorizes a contract to replace a vessel that has been lost, destroyed, or scrapped with a "replacement vessel" that satisfies the eligibility requirements set forth in 46 U.S.C. § 53102(b).  *See* 46 U.S.C. § 53105(f).

**b.**

This leads to Matson's second argument, which focuses on the latter half of the phrase "a vessel *under an operating agreement*."  46 U.S.C. § 53105(f) (emphasis added).  According to Matson, APL's application failed this test because, at the time the DAKAR was approved, the AGATE was not "operating" and, therefore, did not qualify as "a vessel under an operating agreement."  The parties agree that the term "under," as used in this provision, refers to a vessel "bound by" an operating agreement.  Dkt. 35-1 at 32; Dkt. 37-1 at 22; Dkt. 38-1 at 35.  But that is where their agreement ends.

On MARAD and APL's view, a vessel is "covered by"—that is, bound by—an operating agreement, even if it is not operating in compliance with that agreement.  Dkt. 37-1 at 23; Dkt. 38-1 at 35–38.  As explained in the DAKAR Memorandum, the phrase a "vessel under an operating agreement" is susceptible to two possible readings; it might be read to refer to a "vessel *operating* under an operating agreement," or it might be read to refer to a "vessel *covered* under an operating agreement."  Dkt. 46 at 387 (DAR 767) (emphasis in original).  For three reasons, however, MARAD concluded "that the latter construction is the better one."  *Id.*  First, the statutory text distinguishes "between a vessel that is 'operating under the agreement,' *see* 46 U.S.C. § 53105(a)," and "a vessel that is 'covered by an operating agreement,' *see id.* § 53105(c)."  *Id.*  Second, in other similar clauses in the statute, where Congress failed to include a verb between the words "vessel" and "under," "the phrase 'under the agreement'" is "more

naturally read[]" to mean "'covered under an operating agreement.'" *Id.* at 388 (DAR 768). Section 53105(e), for example, provides that "[a] contractor under an operating agreement may transfer the agreement."  46 U.S.C. § 53105(e).  Third, this reading of "under an operating agreement" "is consistent with the structure and purpose of" the replacement vessel provision. Dkt. 46 at 388 (DAR 768).  It promotes "reasonable continuity of service, which promotes the defense purpose that is the primary goal of the MSP program," and it "facilitates program administration and the MSP's goal of" maintaining a Maritime Security Fleet "by affording MSP operators and MARAD flexibility as to the timing of vessel replacements, including the ability to deal with delays in the replacement process."  *Id.* at 388–99 (DAR 768–69).

The DAKAR Memorandum further explained that Matson's alternative reading of the statute "fails to allow for gaps in the replacement process" and "would prohibit a contractor from replacing a Fleet vessel with another vessel if the replacement is not placed in service on the same date that the replaced vessel leaves the Fleet."  *Id.* at 399 (DAR 769).  MARAD was unconvinced that "Congress intended to place such strict limits on an MSP operator or MARAD."  *Id.*  Rather, a host of other provisions of the MSA all recognize "the reality of ship operations, where a gap can arise between a vessel . . . leaving a particular service" and the replacement of that vessel, such as when a vessel suffers an unanticipated casualty, when the replacement vessel is briefly "out of service when the replaced vessel leaves the fleet," or when delays occur in transferring the replacement vessel "from foreign to U.S. registry."  *Id.* at 399–400 (DAR 769–70).  As the DAKAR Memorandum observed: "Under Matson's proposed interpretation, MARAD could not approve a replacement in any of these circumstances—ever." *Id.* at 400 (DAR 770).

In response, Matson argues that, although the "MSA accounts for and permits some gaps in service," such as when "'the vessel is drydocked or undergoing survey, inspection, or repair,'" it does not "provide similar leeway" when a vessel is scrapped. Dkt. 35-1 at 35–36 (quoting § 53106(d)(3)). "A vessel cannot be under (read: 'bound by') an Operating Agreement," on Matson's telling, "if it cannot and does not operate as part of the Fleet." *Id.* at 32 (emphasis omitted). Although Matson presses several arguments in support of this reading of the statute, none overcomes MARAD's plain reading of the text—that is, that "[a] contractor may replace a vessel" that is bound by or that is subject to "an operating agreement with another vessel," 46 U.S.C. § 53105(f), even if the vessel that is bound by the agreement is not currently operating in compliance with the agreement.

Matson first argues that the MSP "was designed to create a fleet of 'active' and 'militarily useful' vessels that . . . are available to meet the needs of the 'national defense'" and, as result, "[i]t is imperative . . . that vessels in the Program be operational." Dkt. 35-1 at 32–33. "That is why," according to Matson, "the MSA makes operation a condition of eligibility," *see* 46 U.S.C. § 53102(b)(2), and why, "[a]s a condition of receiving payment under [the MSA] for a fiscal year for a vessel, the contractor [must] certify . . . that the vessel has been and will be operated . . . for at least 320 days in the fiscal year," *see id.* § 53106(b). Dkt. 35-1 at 33. It is also why, according to Matson, "MARAD adopted a heel-to-toe policy ensuring the Fleet is full of operating vessels." *Id.*

The problem with Matson's argument is that it conflates different provisions of the MSA, which serve different purposes. For the reasons explained above, the plain language of Section 53105(f) is best read to permit MARAD and the contractor to amend an extant operating agreement by removing the vessel that is bound by (or subject to) the agreement and replacing it

with a new vessel, which then becomes bound by (or subject to) the agreement.  The provision

sets two limitations on the exercise of that authority.  The replacement vessel must be "eligible to

be included in the Fleet under [S]ection 53102(b)," and the Secretary of Transportation, "in

conjunction with the Secretary of Defense," must "approve[] the replacement of the vessel."  46

U.S.C. § 53105(f).  So construed, the provision says nothing about whether vessel that is being

replaced remains eligible to participate in the program—it may, for example, have aged out or

may have sustained a catastrophic disability—or whether that vessel has complied with all of the

relevant contractual terms—it may, for example, have been operated in accordance with the

operating agreement for only 319 days in the preceding fiscal year.  As MARAD explains, "if a

vessel is destroyed, the vessel operator may be in breach of the operating agreement—and it may

be that the government would undertake the relevant procedures to terminate the agreement—but

the operating agreement does not simply cease to exist."  Dkt. 43 at 9.

    The provisions that Matson cites, in contrast, address eligibility and compliance with the

contractual terms.  Matson is correct that Section 53105(f) refers to eligibility under

Section 53102(b).  But the replacement vessel provision does not ask whether the vessel that

being replaced remains "eligible to be included in the Fleet," 46 U.S.C. § 53105(f); rather, it asks

whether the replacement vessel is eligible, *id.*  What matters for purposes of the statutory text,

for example, is whether the replacement vessel "is suitable for use by the United States for

national defense or military purposes," *id*. § 53102(b)(4), and not whether the vessel being

replaced satisfied that condition, *see also id*. § 53105(a) (addressing requirements "during the

period a vessel is operating under the agreement").

    Similarly, the requirement that a contractor certify "[a]s a condition of receiving payment

. . . that the vessel has been and will be operated" in accordance with the operating agreement

"for at least 320 days in the fiscal year," *id.* § 53106(b), says nothing about the status of the vessel that is being replaced. Rather, it addresses what the contractor must do receive payment. Indeed, if anything, the certification provision bolsters MARAD's understanding that the MSA distinguishes between the requirements for replacing a vessel that is subject to an existing operating agreement and the separate requirements for obtaining full payment, rather than a reduced pro rata payment, *id.* § 53106(d). Under this statutory structure, the remedy for non-compliance by the original vessel is not to preclude its replacement but, rather, to reduce the compensation owed to the contractor, *see id.*, or, after providing the contractor with an opportunity to cure, to terminate the operating agreement, *id.* § 53104(c).

For the reasons set forth in the DAKAR Memorandum, MARAD's usual "heel-to-toe policy" also does not undercut the agency's reading of Section 53105(f). As the memorandum explains, the heel-to-toe policy is just that—a "policy" that MARAD adopted in 2017 and incorporated in operating agreements starting that year. Dkt. 46 at 391 (DAR 771). Significantly, moreover, the policy is not dictated by—or tied to—Section 53105(f) or any other statutory provision. *Id.* It is a contractual term, which the agency is free to waive in appropriate circumstances. *Id.* Here, MARAD sensibly decided to waive the contractual requirement because APL proposed the SAIPAN as a replacement vessel before the AGATE left the fleet and, then, proposed the DAKAR as a replacement vessel before MARAD had disapproved the SAIPAN as a replacement vessel. *Id.* Under these circumstances, APL complied with the spirit of the policy and, in the words of MARAD, the agency's delay in recognizing that the SAIPAN was not a proper replacement vessel "cannot reasonably be attributed to APL as a breach of the Operating Agreement under all the facts and circumstances." *Id.* at 391–92 (DAR 771–72).

Finally, Matson argues that "MARAD's decision that the DAKAR replaced the AGATE 'under an operating agreement' conflicts with MARAD's recognition elsewhere that the AGATE already had a replacement vessel—the SAIPAN." Dkt. 35-1 at 36 (emphasis omitted). Defendants respond that this is a quirk of the litigation, rather than a problem with the 2022 Approval Order. *See* Dkt. 37-1 at 28; Dkt. 52 at 44–45. The relevant operating agreement— Agreement No. MA/MSP-57—was initially entered on November 18, 2015. Dkt. 46-1 at 12–33 (DAR 1–22); *see id.* at 3 (dating the document 11/18/2015). It named APL Marine Services, Ltd. as the operator and named the AGATE as the vessel under the agreement. *Id.* at 12 (DAR 1); *see also id.* at 16 (DAR 5) (naming the AGATE under Art. I-3). On December 21, 2016, MARAD approved the SAIPAN as replacement vessel for the AGATE and, as part of that 2016 Approval Order, MARAD "approved amendment of the Agreement [No. MA/MSP-57] to replace the Existing Vessel with the Replacement Vessel." Dkt. 46-1 at 98 (DAR 196). APL and MARAD then executed Addendum No. 1 to Operating Agreement No. MA/MSP-57 on March 24, 2017. *Id.* at 34–36 (DAR 23–25). Addendum No. 1 amended Article I-3 of the Operating Agreement "to replace the name, official number, place built, and date built of the vessel named in the Operating Agreement with that of the Replacement Vessel to be now named in the Operating Agreement[:]" the SAIPAN. *Id.* at 35 (DAR 24).

A little over three years later, however—and at Matson's urging—this Court concluded that MARAD had failed adequately to consider an important aspect of its decision to approve the SAIPAN as a replacement vessel for the AGATE, *Matson II*, 466 F. Supp. 3d 177 (D.D.C. 2020), and the Court, accordingly, vacated the 2016 Approval Order and remanded the matter to the agency, *Matson III*, 471 F. Supp. 3d 60 (D.D.C. 2020). That order set aside MARAD's authorization to amend Operating Agreement No. MA/MSP-57 and thus nullified Addendum

No. 1.  The Court's order, accordingly, returned the operating agreement (Agreement No. MA/MSP-57) to its original version, which named the AGATE as the vessel under the agreement.  In MARAD's words, "the extant underlying operating agreement 'snapped back' to the previously approved vessel—the AGATE."  Dkt. 37-1 at 28.

At oral argument, Matson took issue with this understanding and argued that the concept of a "snapback" applies only to vacatur in the rulemaking context, and not to contractual undertakings, like those at issue here.  Dkt. 52 at 5–6.  But Matson never explained why that is so, nor is the distinction that Matson would have the Court draw self-evident.  Here, MARAD approved a request to replace the AGATE with the SAIPAN under the operating agreement.  At Matson's urging, the Court then set that approval aside, thereby negating the authority that MARAD relied upon to make the substitution.  At the time the Court entered its order vacating the 2016 Approval Order, the Court (and the parties) contemplated that the Court's action would nullify APL's Addendum No. 1 and would, absent a new administrative action, remove the SAIPAN from the MSP Fleet.  *Matson III*, 471 F. Supp. 3d at 64–65; *see also* No. 20-cv-2779, Dkt. 27 at 13 (Aug. 4, 2021 Hrg. Tr.).  It makes no difference whether the Court's order was issued in a case seeking review of a rulemaking or an informal adjudication; either way, the Court set aside the agency action—approval of the substitution—which had the effect of returning the parties to the pre-approval state of affairs.  *Cf. Marin Audubon Society v. FAA*, 2025 WL 655062, at *1, *3, — F.4th — (D.C. Cir. Feb. 28, 2025) (staying remand and vacatur of agencies' program to prevent the prior program from being "revived on remand" while the agencies reconsidered).

The relevant chain of events did not end there, however.  MARAD subsequently re-approved the SAIPAN as a replacement vessel for the AGATE in August 2020, Dkt. 46-1 at 238

(DAR 455), before reconsidering its position in April 2021 and asking this Court, once again, to remand the matter to agency for further consideration, No. 20-cv-2779, Dkt. 20. The Court granted MARAD's request and remanded the matter to MARAD without vacatur. No. 20-cv-2779, Min. Entry (Aug. 4, 2021). On remand, MARAD "determined that the APL SAIPAN did not meet the age-eligibility requirement of 46 U.S.C. § 53102(b)(3)(B)," Dkt. 51-1 at 2, and thus was "not eligible to serve as a replacement vessel under Amended and Restated Maritime Security Program (MSP) Operating Agreement No. MA/MSP-57," *id.* at 3. This undid the agency's August 2020 re-approval order, returning the matter to the state of affairs that existed in July 2020—that is, Addendum No. 1 had been nullified and the original operating agreement naming the AGATE remained in place.

Although this is an extended and convoluted chain of events, the logic remains the same as in any case in which an agency approves a contract amendment, only to have a Court set aside that decision or to have the agency reconsider its action. When agency action is set aside by a court, or when an agency reconsiders its action and concludes that it lacked authority to act, the state of affairs will—absent any contravening consideration—revert to preexisting state of affairs. The unlawful agency action is treated as a nullity. Following this logic, by the time MARAD approved the DAKAR as a replacement vessel on June 15, 2022, Dkt. 46-1 at 402 (DAR 782), the operating agreement had reverted to its original status, and the AGATE was the vessel subject to that agreement.[6]

---

[6] Although Matson maintains that MARAD's waiver of its heel-to-toe policy, Dkt. 35-1 at 37, and the Secretary of Defense's original approval of the DAKAR as a suitable replacement for the SAIPAN, *id.* at 38, constitute "inconsistencies" that render the agency's decision arbitrary and capricious, *id.*, the Court agrees with Defendants that these were merely quirks of the parties' sprawling dispute, *see* Dkt. 37-1 at 29–30; Dkt. 38-1 at 36.

Finally, Matson maintains that MARAD's interpretation is odds with congressional intent. It argues that "Congress clearly sought to prohibit MARAD from subsidizing domestic trade except with respect to grandfathered Program vessels" and that, "[f]or that prohibition to have teeth, MARAD cannot allow Program contractors to shuffle an endless parade of 'replacement vessels' into the Fleet to serve domestic trade—especially when the 'replaced' vessel left the Fleet years earlier." Dkt. 35-1 at 33. But Matson offers no support for characterizing the MSP as a subsidy, rather than a contractual *quid pro quo*, nor does it support the contention that MARAD's interpretation of Section 53105(f) renders the 2018 NDAA toothless. Here—as is usually the case—the best indicia of congressional intent is the text, and the 2018 NDAA contemplates that MSP operating permits will permit replacement vessels to operate "in mixed foreign commerce and domestic trade allowed under a registry endorsement issued under [S]ection 12111 of" Title 46. 46 U.S.C. § 53105(a). Nothing in that language, in the language of Section 53105(f), or in a congressional report requires that the replaced vessel remain in operation (by "providing transportation in foreign commerce," *id.* § 53102(b)) on the day (or on the days immediately preceding) when the substitution is approved.

### c.

Finally, Matson invokes the *Chenery* doctrine to argue that MARAD cannot argue "that the AGATE was a 'vessel' in 2022," because it did not rely on that agreement in originally approving the DAKAR, Dkt. 35-1 at 30. *See SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943). Under the *Chenery* doctrine, a court can "uphold agency orders based only on reasoning that is fairly stated by the agency in the order under review." *Casino Airlines, Inc. v. Nat'l Transp. Safety Bd.*, 439 F.3d 715, 717 (D.C. Cir. 2006). According to Matson, "MARAD's 2022 Approval Order expressed *no* position on whether the AGATE qualified as a 'vessel' within the

34

meaning of the replacement vessel statute." Dkt. 35-1 at 31 n.5 (emphasis in original). Nor does it matter, according to Matson, that MARAD concluded in its 2020 Approval Order for the SAIPAN that the scrapping of the AGATE was immaterial because that conclusion "does not show that MARAD considered the meaning of 'vessel' in Section 53105(f)." *Id.*

This argument fails on multiple grounds. To start, as APL argues—and as Matson seems to concede—"by the time MARAD approved the [DAKAR] in June 2022, the agency had already addressed the question of whether the [AGATE] could be replaced." Dkt. 38-1 at 33. To be sure, that analysis came at an early phase of the administrative proceedings and did not include extended analysis, but it is unsurprising that MARAD addressed the argument when Matson first (and most extensively) raised it, *see* Dkt. 46-1 at 103, 146 (DAR273, DAR316), and, as the Supreme Court and the D.C. Circuit have repeatedly emphasized, the courts will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," *Bowman Transp. Inc. v. Arkansas-Best Freight Sys.*, 419 U.S. 281, 286 (1974); *see also State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 42; *Dickson v. Sec. of Defense*, 68 F.3d 1396, 1405 (D.C. Cir. 1995). Here, MARAD's views regarding the meaning of Section 53105(f), as applied to the replacement of a MSP vessel that is no longer in service, are clear.

Matson's argument also fails because the APA directs courts to take "due account . . . of the rule of prejudicial error." 5 U.S.C. § 706. This "rule requires the party asserting error to demonstrate prejudice from the error." *Air Canada v. DOT*, 148 F.3d 1142, 1156 (D.C.Cir.1998); *see also First Am. Discount Corp. v. CFTC*, 222 F.3d 1008, 1015 (D.C. Cir. 2000). Matson, however, makes no effort to identify any prejudice resulting from MARAD's failure to repeat its conclusions regarding the meaning of Section 53105(f)—and its views regarding the relevance of the scrapping of the AGAPE—in its 2022 Approval Order for the

DAKAR.  Nor is there any reason to believe that a remand would serve any purpose.  The agency has already considered the issue, and it explained its conclusions in a prior decision involving the very same vessel (that is, the AGATE).

Even more to the point, under *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), the meaning of Section 53105(f) is ultimately a question for the courts to decide, without according the agency's views on a question of statutory interpretation any deference beyond their persuasive force.  Here, the Court has construed Section 53105(f) and has concluded that MARAD may approve a replacement vessel even when the vessel being replaced is no longer in service.  That resolves the issue, leaving no question of statutory interpretation for the agency to resolve on remand.  Thus, taking "due account . . . of the rule of prejudicial error," 5 U.S.C. 706, and following the Supreme Court's direction in *Loper Bright*, nothing remains for the agency to do on this question of statutory interpretation.[7]

### 2.    *The HERODOTE*

Matson next takes aim at the HERODOTE, arguing that because that vessel transports cargo between the United States and the U.S. territory of Guam, and because it was first covered by an operating agreement after the effective date of the 2018 NDAA, it can only operate under Section 53105(a) if it qualifies as a replacement vessel within the meaning of Section 53105(f).  Dkt. 35-1 at 38.  But, Matson continues, the HERODOTE does not qualify as a replacement vessel because it replaced the GUAM, and, according to Matson, the GUAM was never eligible

---

[7] Although the Supreme Court has not yet addressed whether *SEC v. Chenery Corp.*, 318 U.S. 80 (1943), continues to have force in cases involving questions of statutory interpretation after *Loper Bright*, 603 U.S. 369 (2024), and although it the "prerogative" of the Supreme Court—and the Supreme Court alone—to "overrul[e] its own decisions," *see Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989), this Court must nonetheless take "due account" of whether *Loper Bright* leaves anything further for the agency to do on remand, after the Court has construed the statutory text at issue.

for inclusion in the fleet because it was engaged in trade between the United States and the Northern Mariana Islands. *Id.* at 38–39. Matson's argument fails on both procedural and substantive grounds.

The argument fails on procedural grounds because it constitutes an untimely collateral attack on the GUAM's 2015 Approval Order. When MARAD approved the GUAM in 2015, Matson first challenged that decision in the D.C. Circuit, which rejected the challenge as untimely. *Matson I*, 895 F.3d 799 (D.C. Cir. 2018). Matson then challenged the 2015 Approval Order in this Court, which rejected the challenge on jurisdictional grounds. *Matson II*, 466 F. Supp. 3d 177 (D.D.C. 2020). Matson appealed that decision to the D.C. Circuit, but it abandoned the appeal after MARAD approved the HERODOTE as a replacement vessel. But Matson went a step further and urged the D.C. Circuit to vacate this Court's decision on the ground that the dispute was moot. Invoking the *Munsingwear* doctrine, 340 U.S. 36 (1950), Matson wrote in its motion:

> By virtue of the approval of the CMA CGM HERODOTE and the replacement of the APL GUAM, the APL GUAM is no longer a part of the MSP fleet and *the Approval Order challenged in this litigation no longer has any ongoing effect*. Where, as here, agency action has been "replaced by a subsequent" action of the same nature, the challenge to the original action becomes moot. *See J.T. v. District of Columbia*, 983 F.3d 516, 522–23 (D.C. Cir. 2020). All parties agree that as a result of the agency's actions in approving the CMA CGM HERODOTE, this appeal is moot. . . . Under *Munsingwear*, the "established practice" of courts addressing an appeal in a case "which has become moot while on its way here or pending [the court's] decision on the merits is to reverse or vacate the judgment below and remand with a direction to dismiss."

Plaintiff-Appellant's Motion to Vacate and Remand, No. 20-5219, Doc. 1903372 at 3–4 (D.C. Cir. 2021) (emphasis added).

Although the mootness and standing doctrines are both derived from Article III and the need to ensure "that federal courts decide only 'actual, ongoing controversies,'" *Pub. Citizen,*

*Inc. v. FERC*, 92 F.4th 1124, 1127 (D.C. Cir. 2024), the standards are not identical.  Under the

mootness doctrine, the federal courts will dismiss an action that presented a live case and

controversy when filed only if "events have so transpired that the decision will neither presently

affect the parties' rights nor have a more-than-speculative chance of affecting them in the

future."  *Id.* (cleaned up).  Here, Matson assured the court of appeals that its challenge to the

2015 Approval Order for the GUAM was moot—that is, that it did not presently affect Matson's

rights nor was it likely to affect the company's rights in the future.  But Matson knew that

MARAD had approved the HERODOTE as a replacement vessel, and it knew everything that it

now relies upon to support its claim MARAD lacked authority to approve the HERODOTE as a

replacement vessel because, at least on Matson's telling, the GUAM never lawfully participated

in the MSP fleet.  Whether considered as a matter of judicial estoppel or an untimely collateral

attack, Dkt. 43 at 21–22, the Court agrees with Defendants that Matson cannot now raise the

same challenge to GUAM's status that it previously urged the D.C. Circuit to dismiss as moot.

Even if this Court were to reach the merits of this challenge, though, Matson's argument

would fail.  Matson grounds its challenge to the GUAM on one of the same grounds that it uses

to challenge the DAKAR—it argues that Sections 53105(a)(1)(A) and (a)(1)(B) preclude vessels

participating in the MSP from engaging in trade with the CNMI.  For the reasons explained

below, that argument fails as a matter of law, and thus the GUAM's service to the CNMI did not,

in any event, render the vessel ineligible to participate in the MSP.

## B.    Challenges Based on Trade with the Commonwealth of the Northern Mariana Islands

Matson next asserts that the HERODOTE and the DAKAR are ineligible on their own

accounts because they engage in trade (or are authorized to trade) with the CNMI.  Under the

MSA, an operating agreement for a replacement vessel "shall require" that, "during the period a vessel is operating under the agreement," it "(A) shall be operated exclusively in the foreign commerce or . . . in mixed foreign commerce and domestic trade under a registry endorsement issued under [S]ection 12111 of" Title 46, and "(B) shall not otherwise be operated in the coastwise trade." 46 U.S.C. § 53105(a)(1). According to Matson, this provision imposes an eligibility requirement that neither the HERODOTE nor the DAKAR can satisfy (and that, years earlier, the GUAM did not satisfy). The HERODOTE cannot satisfy this requirement, Matson says, because that vessel is currently engaged in trade with the CNMI, and the DAKAR cannot satisfy the requirement because, although it is not currently engaged in trade with the CNMI, its operating agreement does not prohibit it from engaging in such trade.

Defendants disagree on multiple grounds. First, they stress that Section 53105(a) does not impose *eligibility* requirements; rather, the provision specifies *operating* requirements that MARAD must include in the MSP operating agreements, and a violation of any such terms is enforceable by means of "a pro rata reduction for payment for each day less than 320 in a fiscal year that the vessel is not operated in accordance with" these provisions, 46 U.S.C. § 53106(d), or, in cases of uncorrected, material breaches, eventually contract termination, *id.* § 53104(c). Second, they note that the DAKAR does not ever engage in trade with the CNMI. Third, and most significantly, they read Section 53105(a), Section 12111, and the Covenant for the Commonwealth of the Northern Mariana Islands, to permit trade with the CNMI pursuant to a registry endorsement, meaning that trade is not "coastwise trade."

1.    *Eligibility/Operational Requirements*

As explained in the SAIPAN Memorandum, MARAD reads Section 53105(a) to establish certain terms or conditions that that agency must include in its operating agreements with MSP

contractors, and not to impose eligibility requirements.  *See* No. 22-cv-1975, Dkt. 1-23 at 3–5.

As MARAD correctly observes, the MSA addresses "vessel eligibility" in Section 53102(b), and

unlike in Section 53105(a), "[t]he word 'exclusively' does not appear in [S]ection 53102(b)(2)."

*Id.* at 4.  That reading of the statute is further confirmed by the text of Section 53105(f), which

permits the Secretary to approve a "replacement vessel" if that vessel "is eligible to be included

in the Fleet under [S]ection 53102(b)."  46 U.S.C. § 53105(f).  The statute does *not* say that a

vessel is ineligible to "replace a vessel under an operating agreement," *id.*, unless it operates

"exclusively in the foreign commerce or . . . in mixed foreign commerce and domestic trade

allowed under a registry endorsement," *id.* § 53105(a)(1)(A).  It merely says that the operating

agreement must "require that, during the period a vessel is operating under the agreement," the

vessel must operate in a manner consistent with Section 53105(a)'s commerce requirements.  *Id.*

And, as MARAD also correctly observes, *see* No. 22-cv-1975, Dkt. 1-23 at 4, the MSA tells

MARAD what to do if a contractor is non-compliant: the Secretary "shall make a pro rata

reduction in payment for each day less than 320 in a fiscal year that the vessel is not operated in

accordance with paragraphs (1) and (2) of [S]ection 53105(a)," 46 U.S.C. § 53106(d), or may

eventually terminate the agreement, *id.* § 53104(c).  The Court agrees with MARAD (and APL)

that this understanding of the MSA is most faithful to the statutory text.

 At this point, however, MARAD's argument hits a speedbump.  As Matson points out,

the MSP implementing regulations provide that "[a] vessel is eligible to be included in an MSP

Operating Agreement if . . . [t]he vessel is operated . . . to provide transportation in the foreign

commerce," 46 C.F.R. § 296.11(a)(2), and the regulations define "[f]oreign commerce" to mean

"a cargo freight service . . . operated *exclusively* in the foreign trade or in mixed foreign and

domestic trade allowed under a registry endorsement," *id.* § 296.2 (emphasis added).  According

to Matson, this renders the statutory distinction between eligibility requirements and contractual terms meaningless, since the regulations—at least by cross-reference—treat exclusivity as an eligibility requirement.

MARAD considered and rejected this argument in the SAPAIN Memorandum. There, the agency first observed that, to the extent the statute and regulation conflict, the statute is necessarily controlling. *See* No. 22-cv-1975, Dkt. 1-23 at 6. But, in any event, the regulations can—and should—be interpreted in a manner that avoids any inconsistency "'with the statute under which they [were] promulgated.'" *Id.* at 7 (quoting *Decker v. Nw. Env't Def. Center*, 568 U.S. 597, 609 (2013)). That is possible here, according to MARAD, because two regulatory definitions point in different directions, requiring the agency to determine which definition is more specific and more on point—and more consistent with the statute. *Id.* In particular, in addition to the general definition of "[f]oreign commerce" that Matson invokes, the regulations define the more specific term "[e]ligible vessel" to mean "a vessel that meets the requirements of § 53102(b) of the MSA 2003." 46 C.F.R. § 296.2. And Section 53102(b) omits the exclusivity requirement. For this reason, MARAD interpreted its own regulations "to provide for the consideration of the vessel's operation in 'foreign commerce' under the statutory definition of the term, rather than the conflicting and more restrictive regulatory definition." No. 22-cv-1975, Dkt. 1-23 at 7.

But Matson continues to press its argument and insists that no conflict exists between the statutory and regulatory text; rather, MARAD was free to "impose additional restrictions beyond those contemplated by the statute," and it was entitled to "do so through the implementation of regulations." Dkt. 40 at 49–50. That contention, however, fails to grapple with the inconsistency in the regulatory text—the regulations define an "[e]ligible vessel" as "a vessel

41

that meets the requirements of § 53102(b)," 46 C.F.R. § 296.2, while they also say that "[a] vessel is eligible to be included in an MSP Operating Agreement" if it "will be operated to provide transportation in the foreign commerce," *id.* § 296.11(a), and then define "[f]oreign commerce" to mean a service "operated exclusively in the foreign trade or in mixed foreign and domestic trade" pursuant to a registry endorsement, *id.* § 296.2.  MARAD was entitled to resolve this conflict (or ambiguity) in its own regulations, and it did so in manner that was not only reasonable, *see Kisor v. Wilkie*, 588 U.S. 558 (2019), but the better reading of the overall regulatory and statutory framework.  Indeed, it is implausible to suggest, as Matson does, that MARAD made a considered decision to adopt a more stringent set of eligibility requirements than those specified in Section 53102(b), but did so through a cross-reference to the general definition of "[f]oreign commerce," while leaving in place the conflicting definition of "[e]ligible vessel."  Rather, as MARAD has cogently explained, when the MSA cross-references Section 12111, it "'brings the old soil with it,'" including the clarification of the registry endorsement authority found in the Coast Guard's implementation regulations.  Dkt 46-1 at 259 (DAR 476) (quoting F. Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Columbia L. Rev. 527, 537 (1947)).

Matson next urges the Court to set aside the challenged orders on the grounds that neither expressly relied on the distinction between eligibility and operational requirements.  Dkt. 40 at 47.  Because "[t]his rationale appears nowhere in either of the Orders on review," Matson continues, "MARAD cannot rely on it here."  *Id.* at 49 (citing *SEC v. Chenery Corp.*, 318 U.S. 80 (1943)).  That argument, however, ignores the fact that MARAD addressed this very issue at length in the SAPIAIN Memorandum, which responded to Matson's arguments at an early phase of Matson's ongoing (and prolonged) effort to convince MARAD not to approve APL

replacement vessels under the MSP.  No. 22-cv-1975, Dkt. 1-23.  It is of no moment that MARAD did not repeat its analysis in its more recent memoranda or orders.  As the D.C. Circuit, has explained: "*Chenery I*'s concern . . . is not focused so much on the specific location of the agency's rationale as it is on the agency's articulation of its rationale at the time it takes action so that a court is able to review that rationale."  *MediNatura, Inc. v. FDA*, 998 F.3d 931, 942 (D.C. Cir. 2021) (emphasis omitted).  Here, MARAD's interpretation of the MSA and its implementing regulations was clearly set forth before the agency issued the two orders at issue here, and there is no plausible basis to suggest that MARAD invented that rationale in the course of this litigation.

Finally, Matson argues that, even if the exclusivity requirement constitutes an operating requirement rather than an eligibility requirement, it would be "arbitrary and capricious for MARAD to approve a vessel for inclusion in the Fleet if it knew from the outset that the vessel could not lawfully operate in the Program and receive subsidies."  Dkt. 35-1 at 51 (citing *State Farm*, 463 U.S. at 43).  But, as explained above, vessels may participate in the MSP, even when they engage in non-operating agreement activities for part of the year.  A vessel receives full payment so long as it is operated in accordance with the operating agreement's geographic requirements for 320 days each fiscal year.  *See* 46 U.S.C. § 53105(b).  Vessels operated for fewer days receive reduced payments.  *Id.* § 53106(d)(3).  That statutory payment structure envisions that a vessel might engage in other activities, and so it was neither arbitrary nor capricious for MARAD to approve such a vessel.

The Court, accordingly, concludes that both approval orders can be sustained on this ground alone.  But, as explained below, the Court is also persuaded that, even if Section 53105(a) were treated as an eligibility requirement, the orders would survive scrutiny.

2.    *Operation of MSP Vessels Pursuant to Section 53105(a)*

Section 53105(a) requires that an operating agreement covering a "replacement vessel" must specify that, "during the period a vessel is operating under the agreement[,] the vessel" (1) "shall be operated exclusively in the foreign commerce or . . . in mixed foreign commerce and domestic trade allowed under a registry endorsement issued under [S]ection 12111," and (2) "shall not otherwise be operated in the coastwise trade." 46 U.S.C. § 53105(a). The Court will consider, in turn, whether trade with the Commonwealth of the Northern Mariana Islands violates either of these requirements.

**a.**

As noted, Section 53105(a)(1)(A) allows replacement vessels operating under an MSP agreement to engage "in mixed foreign commerce and domestic trade allowed under a registry endorsement issued under [S]ection 12111." 46 U.S.C. § 53105(a)(1)(A). Section 12111, in turn, permits the Coast Guard to issue a registry endorsement "for a vessel that satisfies the requirements of [S]ection 12103," 46 U.S.C. § 12111(a), which sets forth "[g]eneral eligibility requirements" for vessels, including that they be owned by U.S. citizens and that they weigh "at least 5 net tons," *id.* § 12103. Section 12111 then provides that "[a] vessel for which a registry endorsement is issued may engage in foreign trade with Guam, American Samoa, Wake, Midway, or Kingman Reef." 46 U.S.C. § 12111(b). As Matson points out, this list does not include the CNMI—although, it bears note, nor does it exclude the CNMI. The Coast Guard's implementing regulation, however, adds to the list of activities that "[a] registry endorsement entitles a vessel" to engage in: in addition to foreign trade and trade with Guam, American Samoa, Wake, Midway, and Kingman Reef, a vessel with a registry endorsement may engage in

"any other employment for which a coastwise or fishery endorsement is not required."[8]   46 C.F.R. § 67.17(a).[9]

One issue that the Court need not decide in this case is whether the Coast Guard's implementing regulation is consistent with Section 12111.  Recognizing that Matson itself relies on registry endorsements issued under Section 12111 to engage in trade with the CNMI, *see* Dkt. 38-3 at 18, *Matson VIII*, Oral Arg. Tr. 17:5–15 (D.C. Cir.) (Judge Pan: "Your client is very active, the most dominant, apparently, carrier to the Mariana Islands.  Your client is using one of these endorsements under [Section 12111], which has been interpreted by the Coast Guard to allow trade to the Northern Mariana Islands."), the Court asked counsel for Matson at oral argument whether the company was arguing that the Coast Guard regulation was "ultra vires to the extent it goes beyond listing [the specific] territories" listed in Section 12111(b), Dkt. 52 at 35–37.  And to avoid any confusion on the issue, the Court permitted Matson to clarify its position after oral argument.  Maston did so and "confirm[ed] that it is not challenging the lawfulness of the Coast Guard regulation at 46 U.S.C. § 67.17."  Dkt. 53.

This concession resolves the question whether a registry endorsement "issued under [S]ection 12111" can allow a vessel to engage in "mixed foreign and domestic trade," 46 U.S.C. § 53105(a)(1)(A), "for which a coastwise, or fishery endorsement is not required," 46 C.F.R. § 67.17.  It is too much of a stretch to suggest—as, perhaps, Matson does, *see* Dkt. 35-1 at 47—

---

[8]  None of the parties suggest that a fishery endorsement is required for APL to engage in trade with the CNMI.

[9] Matson argues that MARAD should not be permitted to rely on the Coast Guard regulation in this litigation because it "did not cite to or rely on 46 C.F.R. § 67.16(a) in either of the Orders or Approval memos on review."  Dkt. 35-1 at 43.  But even Matson acknowledges that MARAD *did* "refer[] to the regulation in the memorandum accompanying the 2020 Approval Order for the SAIPAN."  *Id.* at 43 n.7.  For the reasons explained above, MARAD can appropriately rely on material included in that memorandum as grounds for its decision.  *See supra* III.B.1.

that the shipping laws recognize two different standards for issuance of a registry endorsement, one for purposes of the Coast Guard's rules and one for purposes of the MSP. The plain language of Section 53105(a)(1)(A) simply asks whether the vessel is engaged in trade that is allowed under a registry endorsement issued by the Coast Guard. Nor is there any reason to believe that Congress intended to adopt a different meaning of "registry endorsement" for purposes of the MSP than the one it uses for all other purposes.[10]

But that leaves the more substantial question presented here—that is, whether the HERODOTE's "registry endorsement," Dkt. 45 at 36 (HAR 130), allows the vessel to engage in trade with the CNMI. The answer to that question, in turn, requires the Court to determine whether a "coastwise, or fishery endorsement is . . . required" to engage in that trade. 46 C.F.R. § 67.17(a). And that question leads the Court to the Covenant for the Northern Mariana Islands, which extends the reach of the "coastwise laws" to "the activities of the United States Government and its contractors," Covenant, § 502(b), but not otherwise. In other words, as MARAD has explained, *see*, *e.g.*, Dkt. 46 at 156, 238, 259–60, 264–65, 267 (DAR 330, 455, 475–76, 480–81, 484), a "coastwise endorsement" is not required to engage in trade between the CNMI (including Saipan) and other points in the United States, except when that trade involves "the activities of the United States or its contactors."

---

[10] Matson also argues that the HERODOTE's approval order should be vacated and remanded on the basis that MARAD "fail[ed] to make any attempt to grapple with" the question of whether "trade to and from the Northern Mariana Islands" is "domestic trade allowed under a registry endorsement" for purposes of Section 53105(a)(1)(A). Dkt. 35-1 at 47–48. On Matson's telling, MARAD focused entirely on "whether the HERODOTE's domestic trade in the Northern Mariana Islands qualifies as coastwise trade under Section 53105(a)(1)(*B*)" and skipped over an equally important analysis required with respect to Section 53105(a)(1)(*A*). *Id.* (emphasis added). But, as explained below, these questions overlap in all material respects.

This is no solution, according to Matson, because (at least on Matson's telling) the HERODOTE's (and potentially the DAKAR's) Saipan trade constitutes "the activities of the United States Government and its contractors" for purposes of Section 502(b) of the Covenant. In particular, Matson maintains, every operator of a vessel in the MSP is required to enter into an operating agreement; those agreements, in turn, "require the contractor to operate the vessel 'exclusively in foreign commerce' . . . or 'mixed foreign and domestic trade allowed under a registry endorsement,'" and thus when APL operates the HERODOTE in trade with the CNMI, it does so "as part of the 'activities of the United States Government and its contractors.'"  Dkt. 35-1 at 45 (quoting Covenant, § 502(b)).  Matson also disputes MARAD's conclusion that a vessel engages in coastwise trade with the CNMI only when it carries the "cargo" of the United States (or carries cargo on behalf of the United States); rather, as Matson notes, the Covenant refers to "the activities of the United States Government" and not the carriage of U.S. cargo.  *Id.* at 45–46. Finally, Matson notes that the MSA refers to MSP participants as "contractors," Dkt. 40 at 46, further supporting the company's contention that APL is operating the HERODOTE as a U.S. contractor.  The Court is unpersuaded.

Taking the last of these arguments first, the fact that the MSA refers to MSP participants as "contractor[s]" has little bearing on the proper construction of Section 502(b) of the Covenant. They are different laws that serve different purposes.  Nor does the MSA declare that the operator of a participating vessel is a contractor of the United States for all purposes relating to the vessel.  And, most significantly, the text of the Section 502(b) of the Covenant does not apply to all U.S. contractors, regardless of whether they are acting on behalf of the United States. Rather, it provides that the laws of the United States relating to coastwise trade "will apply to the *activities* of the United States Government and its contractors in the Northern Mariana Islands."

Covenant, § 502(b) (emphasis added).  That language is best construed to refer to the "activities of the United States Government," regardless of whether those activities are undertaken directly by the United States or indirectly by a U.S. government contractor.  Indeed, it would border on the absurd to suggest that any company that does any business with the United States, regardless of the nature or extent of the business, falls within the scope of Section 502(b) of the Covenant.

At oral argument, counsel for Matson acknowledged as much and clarified that its "position is not that anyone with a government contract for anything is a contractor with the Government" under the Covenant.  Dkt. 52 at 39.  Thus, for example, if a hypothetical shipper "has a contract for harbor maintenance in Alaska, that doesn't necessarily make them a contractor if they are calling the Northern Mariana Islands." *Id.*  But Matson contends that APL is in a different position than this hypothetical shipper because its vessels are "calling the territory, pursuant to a contract." *Id.* at 93–94.  As counsel explained at oral argument:

> [W]hat is different here is that every time APL's vessels call the Northern Mariana Islands, they are doing so pursuant to their operating agreements.  The operating agreements require them to exercise these vessels in trade, 320 days a year.  And they authorize—they actually name the trade routes in the orders.  That is fulfilling the obligations of the contract.  It makes them, when they call the Northern Mariana Islands, acting under their contract under their operating agreement.  So that would be the activity of a contractor of the United States.  In contrast to . . . a company that just has a government contract for something completely unrelated.

*Id.* at 39.

But nothing in the HERODOTE (and certainly nothing in the DAKAR) operating agreement *requires* APL to engage in trade with the CNMI; to the contrary, the 2021 Approval Order merely "[n]oted that . . . APL will operate the HERODOTE in established trade in the Western Pacific pursuant to a registry endorsement, including the Commonwealth of the Northern Mariana Islands . . . but will not carry United States cargo between any State or Territory of the United States and CNMI, except as permitted by U.S. Customs and Boarder

Protection[] and Sec. 502(b) of the Covenant." Dkt. 45 at 67–68 (HAR 161–62). That language did not create an obligation by APL to engage in that trade but, rather, provided the foundation for MARAD to conclude that the HERODOTE would be operated in compliance with Section 53015(a)(1)(A). The Addendum to the Amended and Restated Maritime Security Program Operating Agreement with APL Maritime, Ltd.—that is, the operative document for purposes of defining APL's legal obligations to MARAD—moreover, says nothing about trade with the CNMI. *Id.* at 75–77 (HAR 169–71). In short, although APL is required to operate the HERODOTE in covered trade, it is not required to engage in trade with the CNMI, and it is not acting as a U.S. contractor when it ships private cargo to or from the CNMI. The "activity" of shipping that cargo is not an "activity" of the United States or its contractors.

To be sure, MARAD's understanding of when a contractor is engaged in "the activities" of the United States has evolved slightly over time, but the agency's view has not changed in any material respect. When considering this issue on remand after this Court issued its decision in *Matson II*, MARAD drew the distinction based on the types of cargo being carried, concluding that "*commercial cargo* may be transported between U.S. Ports and the CNMI on U.S.-flag vessels such as the APL SAIPAN with registry endorsements" but that "the carriage of *U.S. Government cargo* between U.S. Ports and the CNMI must be undertaken on U.S.-flag vessels with coastwise endorsements." Dkt. 46-1 at 238 (DAR 455) (emphasis in original). In support of that view, MARAD pointed to prior rulings by U.S. Customs and Border Protection that treat the shipment of commercial cargo to the Northern Mariana Islands as not subject to the coastwise laws. *Id.* at 258 n.29 (DAR 475) (citing *Applicability of the coastwise laws to proposed passenger and cargo vessel movements between Guam and points in the Commonwealth of the Northern Mariana Islands*, HQ 109583, 1988 WL 360507 (1988)). Now,

49

however, MARAD takes a slightly more expansive view and would also include "[c]argo carried under contract for the government, even if that cargo is owned by a third party." Dkt. 43 at 34. Under either construction, however, the HERODOTE is not engaged in "the activities of the United States" when it engages in commercial trade with the CMNI. There is no indication in the record that the HERODOTE has ever carried cargo to or from the CNMI under a contract with the United States.

Matson responds that this interpretation of Section 502(b) of the Covenant is still too narrow and that the "activities" of a contractor are broader than just carrying cargo. Dkt. 40 at 43. For support, it points to an earlier draft of the Covenant that limited the coastwise laws to "government shipments." *Id.* at 45. According to Matson, the fact that the drafters of the Covenant changed the clause is significant and suggests that they intended to broaden the reach of the coastwise laws beyond "government shipments." *Id.* But, as APL notes in response, it is just as likely that the change was merely "stylistic," and "[t]here is no indication *anywhere* in the history of the Covenant that its negotiators intended this revision to alter the scope of the coastwise laws' application to the Commonwealth." Dkt. 38-1 at 53 (emphasis in original). The Court agrees with APL that this drafting history sheds little light on its scope, and the Court is left to rely on the text, which focuses on "the activities" of the United States, regardless of whether those activities are undertaken by the United States itself or one of its contractors.

Nor is the Court persuaded that Section 502 of the Covenant can be read as expansively as Matson suggests. Matson's contention that the Covenant is not limited to the carriage of cargo on behalf of the United States ignores the other words of the provision: Section 502 applies, in relevant respects, to "[t]he laws of the United States regarding coastal shipments," Covenant, § 502(b), and those laws, as relevant here, regulate "the transportation of merchandise

50

by water . . . between points in the United States to which the coastwise laws apply," 46 U.S.C. § 55102(b).  Thus, read in context, the "activities of the United States and its contactors" refers to the transportation of merchandise, and even assuming that the MSA creates an ongoing contractual obligation for participating vessels to operate "in the foreign commerce or . . . mixed foreign commerce and domestic trade," *id.* § 53015(a)(1)(A), it is a stretch too far to maintain that participating vessels are transporting merchandise on behalf of the United States.

To be sure, a participating vessel must stand ready, if needed, "to meet national defense and other security requirements," and it must help "maintain a United States presence in international commercial shipping."  *Id.* § 53102(a).  But, beyond that, MARAD has no stake in which ports the vessel calls upon "in foreign commerce or . . . mixed foreign commerce and domestic trade," *id.* § 53105(a)(1)(A), or in what merchandise the vessel transports to or from those ports.  The Court is, therefore, unpersuaded that a vessel is engaged in "activities of the United States Government or its contractors" when the government has no interest in the transportation of the relevant merchandise to or from any particular port and, more importantly, has no contractual right to compel the vessel to engage in that, as opposed to any other, foreign or mixed trade.

**b.**

Finally, Matson argues that MARAD's approval orders for the HERODOTE and the DAKAR must be set aside because the vessels are "otherwise . . . operated in the coastwise trade," 46 U.S.C. § 53105(a)(1)(B).  Dkt. 35-1 at 44; Dkt. 40 at 43–46.  But this is merely a reprise of the arguments just discussed and rejected.  As Matson correctly observes, Section 53105(a)(1)(B) requires MARAD to include a term in its MSP operating agreements specifying that, "during the period a vessel is operating under the agreement," it "shall not otherwise be

operated in the coastwise trade."  46 U.S.C. § 53105(a)(1)(B).  Under Section 55101, however, "[t]he coastwise laws do not apply to . . . the Northern Mariana Islands, except as provided in [S]ection 502(b) of the Covenant To Establish a Commonwealth of the Northern Mariana Islands in Political Union With the United States of America."  46 U.S.C. § 55101(b).  And, as explained above, Section 502(b) of the Covenant does not alter this default rule when, as here, a shipping company makes "coastal shipments" "in the Northern Mariana Islands" but does not make those shipments on behalf of the United States.

## CONCLUSION

For the foregoing reasons, the Court will **DENY** Matson's motion for summary judgment as to both the 2021 Approval Order for the HERODOTE and the 2022 Approval Order for the DAKAR, and the Court will **GRANT** Defendant and Defendant-Intervenor's cross-motions for summary judgment as to both the 2021 Approval Order for the HERODOTE and the 2022 Approval Order for the DAKAR.

A separate order will follow.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  March 7, 2025

52